UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| JAMES PARK, Derivatively On Behalf of CERIDIAN CORPORATION, | ) | Case No. 04. 3798ADM|AJB |
| | ) | |
| | ) | VERIFIED SHAREHOLDER DERIVATIVE |
| Plaintiff, | ) | COMPLAINT FOR BREACH OF |
| | ) | FIDUCIARY DUTY, ABUSE OF |
| vs. | ) | CONTROL, GROSS MISMANAGEMENT, |
| | ) | WASTE OF CORPORATE ASSETS AND |
| RONALD L. TURNER, JOHN R. EICKHOFF, | ) | UNJUST ENRICHMENT |
| ROBERT H. EWALD, SHIRLEY J. HUGHES, | ) | |
| GARY A. KROW, GARY M. NELSON, | ) | |
| WILLIAM J. CADOGAN, NICHOLAS D. | ) | |
| CHABRAJA, RONALD T. LEMAY, GEORGE | ) | |
| R. LEWIS, CAROLE J. UHRICH AND ALAN | ) | |
| F. WHITE, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| CERIDIAN CORPORATION, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

SCANNED

AUG 13 2004

U.S. DISTRICT COURT MPLS

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Ceridian Corporation ("Ceridian" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of Minnesota law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between April 17, 2003 and the Present (the "Relevant Period") and that have caused substantial losses to Ceridian and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Minnesota so as to render the exercise of jurisdiction by the Minnesota courts permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Ceridian occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

1

## SUMMARY OF THE ACTION

5.    Ceridian offers a broad range of managed human resource solutions designed to help companies maximize the value of their people by more effectively managing their work forces and the information that is integral to human resource processes.  The Company's human resource management solutions include payroll processing and integrated human resource information systems solutions; tax filing services; benefits administration; qualified retirement and other plan administration; regulatory compliance services; work-life effectiveness; and employee-assistance programs.  In June 2002, the Company acquired HR Comply, a human resource compliance publisher for businesses.  Under the agreement, Ceridian acquired the assets of HR Comply and fully integrated HR Comply services into its solution suite.

6.    During the Relevant Period, defendants caused Ceridian's shares to trade at artificially inflated levels through the issuance of false and misleading financial statements, which included the improper capitalization as assets of certain costs which should have been expensed.  Defendants took advantage of the inflated share price by selling 223,115 shares of their individual Ceridian holdings for proceeds of over $4.1 million.

7.    On February 18, 2004, the Company announced it would restate its 2000-2003 financials due to a revenue recognition change within its Stored Value System ("SVS") business unit.

8.    The Company's stock declined on this news.  However, the stock soon recovered due to defendants' assurances that the change was limited in scope and would not materially impact futures results.

9.    On July 19, 2004, the Company announced the postponement of its Q2:04 earnings release and investor call previously scheduled for Tuesday, July 20, 2004.  The defendants were struggling to conceal that the Company's capitalization and expensing of certain costs in its U.S. Human Resource Solutions ("HR Solutions") business were false.  This false accounting will adversely impact the Company's Q2:04 results as well as previously reported periods and guidance.

2

This was the second time in as many quarters that an accounting issue had taken center stage.

10.   On this news, Ceridian's stock price dropped to $18.20 per share, on volume of 6.8 million shares.

11.   Defendants' revelations indicate that the Company's comprehensive HR Solutions deals, which often require upfront customization work during the implementation process, were falsely accounted for. The Company has been capitalizing these upfront costs rather than expensing them immediately. As a result, the prior results need to be restated. The Company capitalized approximately $30 million of internally developed software expenses in its HR Solutions division in 2003. If expensed, this would reduce FY:03 EPS by some $0.13.

12.   In order to inflate the price of Ceridian's stock, defendants caused the Company to falsely report its results for FY:03 and Q1:04 through improper capitalization of costs.

13.   The Company's 2003 and Q1:04 results were included in a Form 10-K or in Form 10-Qs filed with the SEC. The results were also included in press releases disseminated to the public.

14.   Ceridian has now admitted that its 2000-2003 results were false due to revenue recognition and that it is investigating capitalization of costs such that its 2003 to Q1:04 financial statements were not a fair presentation of Ceridian's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") rules.

## THE PARTIES

15.   Plaintiff James Park is, a citizen of the State of New York, is and was at times relevant hereto, an owner and holder of Ceridian common stock.

16.   Nominal defendant Ceridian is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 3311 East Old Shakopee Road, Minneapolis, Minnesota 55425.

17.   Defendant Ronald L. Turner ("Turner") is, and at all times relevant hereto was,

3

Chairman of the Board of Directors (the "Board"), President, Chief Executive Officer ("CEO") and a director of Ceridian. Because of Tuner's positions, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Turner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Ceridian paid defendant Turner $1,443,438, in salary, bonus and other compensation, awarded him 37,010 restricted shares of Ceridian, and granted him 275,000 options to purchase Ceridian stock. During the Relevant Period, Turner sold 55,035 shares of Ceridian stock for proceeds of $1,097,519.60. Turner is a citizen of Minnesota.

18.     Defendant John R. Eickhoff ("Eickhoff") is, and at all times relevant hereto was, Executive Vice President and Chief Financial Officer ("CFO") of Ceridian. Because of Eickhoff's positions, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Eickhoff participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Ceridian paid defendant Eickhoff $722,588, in salary, bonus and other compensation, and granted him 190,500 options to purchase Ceridian stock. During the Relevant Period, Eickhoff sold 165,298 shares of Ceridian stock for proceeds of $2,961,607.42. Eickhoff is a citizen of Minnesota.

19.     Defendant Robert H. Ewald ("Ewald") is, and at all times relevant hereto was, a director of Ceridian. In addition, Ewald currently serves as Executive Vice President of Ceridian and

4

President of Ceridian Human Resources Solutions since July 2003. Because of Ewald's positions, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Ewald participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Ceridian paid defendant Ewald $523,662 in salary, bonus and other compensation, awarded him 508,188 shares of restricted Ceridian stock, and granted 166,650 options to purchase Ceridian stock. During the Relevant Period, Ewald sold 3,029 shares of Ceridian stock for proceeds of $54,522. Ewald is a citizen of California.

20.     Defendant Shirley J. Hughes ("Hughes") is, and at all times relevant hereto was, Senior Vice President, Human Resources of Ceridian. Because of Hughes' position, she knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. During the Relevant Period, Hughes participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Hughes sold 742 shares of Ceridian stock for proceeds of $15,255. Hughes is a citizen of Minnesota.

21.     Defendant Gary A. Krow ("Krow") is, and at all times relevant hereto was, Executive Vice President of Ceridian. Because of Krow's position, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and

via reports and other information provided to him in connection therewith. During the Relevant Period, Krow participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Ceridian paid defendant Krow $629,878, respectively, in salary, bonus and other compensation, awarded him 184,349 shares of restricted Ceridian stock, and granted him 76,000 options to purchase Ceridian stock. During the Relevant Period, Krow sold 1,118 shares of Ceridian stock for proceeds of $22,986.08. Krow is a citizen of Tennessee.

22.     Defendant Gary M. Nelson ("Nelson") is, and at all times relevant hereto was, Executive Vice President, General Counsel and Corporate Secretary of Ceridian. Because of Nelson's positions, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Nelson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Ceridian paid defendant Nelson $509,507 in salary, bonus and other compensation, awarded him 123,020 restricted shares of Ceridian stock, and granted him 50,750 options to purchase Ceridian stock. During the Relevant Period, Nelson sold 922 shares of Ceridian stock for proceeds of $18,956. Nelson is a citizen of Minnesota.

23.     Defendant William J. Cadogan ("Cadogan") is, and at all times relevant hereto was, a director of Ceridian. Because of Cadogan's position, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

6

During the Relevant Period, Cadogan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Cadogan is a citizen of Minnesota.

24.     Defendant Nicholas D. Chabraja ("Chabraja") is, and at all times relevant hereto was, a director of Ceridian. Because of Chabraja's position, he knew the adverse non-public information about the business of Ceridian, as well as its improper account procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Chabraja participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Chabraja is a citizen of Virginia.

25.     Defendant Ronald T. LeMay ("LeMay") is, and at all times relevant hereto was, a director of Ceridian. Because of LeMay's position, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, LeMay participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. LeMay is a citizen of Missouri.

26.     Defendant George R. Lewis ("Lewis") is, and at all times relevant hereto was, a director of Ceridian. Because of Lewis's position, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

7

committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Lewis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Lewis is a citizen of Massachusetts.

27.     Defendant Carole J. Uhrich ("Uhrich") is, and at all times relevant hereto was, a director of Ceridian. Because of Uhrich's position, she knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Uhrich participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Uhrich is a citizen of Massachusetts.

28.     Defendant Alan F. White ("White") is a director of Ceridian and has been since May 2003. Because of White's position, he knew the adverse non-public information about the business of Ceridian, as well as its improper accounting procedures, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, White participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. White is a citizen of Massachusetts.

29.     The defendants identified in &&17, 19, 23-28 are referred to herein as the "Director Defendants." The defendants identified in &&17-22 are referred to herein as the "Officer Defendants." The defendants identified in &&17-22 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling

Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.    By reason of their positions as officers, directors and/or fiduciaries of Ceridian and because of their ability to control the business and corporate affairs of Ceridian, the Individual Defendants owed Ceridian and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Ceridian in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ceridian and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31.    Each director and officer of the Company owes to Ceridian and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ceridian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Ceridian, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Ceridian.

33.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ceridian, and was at all times acting within the course and scope of such agency.

34.    To discharge their duties, the officers and directors of Ceridian were required to

9

exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Ceridian were required to, among other things:

        (a)     refrain from acting upon material inside corporate information to benefit themselves;

        (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

        (c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

        (e)     remain informed as to how Ceridian conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

        (f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

        35.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ceridian, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Ceridian's Board during the Relevant Period.

36.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Ceridian has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending Ceridian and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

37.     Moreover, these actions have irreparably damaged Ceridian's corporate image and goodwill. For at least the foreseeable future, Ceridian will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Ceridian's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

11

conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

39.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Ceridian and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Ceridian, regarding the Individual Defendants' management of Ceridian's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

40.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least April 2003 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Ceridian was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Ceridian's financial performance and future business prospects, as alleged herein.

41.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Ceridian common stock so they could: (i) dispose of over $4.1 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial

12

compensation and prestige they obtained as a result thereof.

42.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

44.     Ceridian offers a broad range of managed human resource solutions designed to help companies maximize the value of their people by more effectively managing their work forces and the information that is integral to human resource processes. The Company's human resource management solutions include payroll processing and integrated human resource information systems solutions; tax filing services; benefits administration; qualified retirement and other plan administration; regulatory compliance services; work-life effectiveness; and employee-assistance programs. In June 2002, the Company acquired HR Comply, a human resource compliance publisher for businesses. Under the agreement, Ceridian acquired the assets of HR Comply and fully integrated HR Comply services into its solution suite.

## IMPROPER STATEMENTS

45.     On April 17, 2003, the Individual Defendants caused the Company to issue a press release entitled "Ceridian Corporation Reports Solid First Quarter Results." The press release stated in part:

> Ceridian Corporation today reported first quarter 2003 earnings.
>
> First quarter 2003 net earnings were $26.7 million, or $.18 per diluted share of common stock, on revenue of $314.6 million.   Supplementary schedules containing comparative 2002 quarterly results, adjusted for non-recurring items, are available on Ceridian Corporation's website at www.ceridian.com
>
> "I am very pleased with Ceridian's operating results for the first quarter of 2003 and believe we are off to a good start for the year," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian.
>
> "The Human Resource Solutions (HRS) business again met revenue growth expectations despite significant economic uncertainty and continuing deferrals of capital spending decisions.  I am particularly encouraged that customer retention is ahead of plan, and that our win rates on new business remain high.  Even though order levels during the quarter were down slightly compared to a very strong first quarter last year, strong customer signings so far in April and a robust sales pipeline give us confidence that we can post double-digit order increases for the remainder of the year."[sic]
>
> "Comdata's performance during the quarter exceeded our expectations, despite the on-going challenges in both the transportation and retail markets. Revenue during the quarter was greater than our expected range with high transaction volumes in both transportation and Stored Value Systems (SVS).   Comdata's emerging businesses in local fleet services and payroll cards gained traction during the quarter and contributed meaningfully to growth. SVS' solid performance in gift card sales and transactions is expected to continue through the balance of the year."[sic]
>
> "Company-wide, we are aggressively controlling expenses while continuing to invest in product and service enhancements."

46.     On July 17, 2003, the Individual Defendants caused the Company to issue a press release entitled "Ceridian Corporation Reports Solid Second Quarter Results." The press release stated in part:

> Ceridian Corporation today reported second quarter 2003 earnings.

14

Second quarter 2003 net earnings were $25.4 million, or $.17 per diluted share of common stock, on revenue of $297.8 million. Supplementary schedules containing comparative 2002 quarterly results are available on Ceridian Corporation's website at www.ceridian.com.

"I am pleased with Ceridian's operating results for the second quarter of 2003," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian.

"The Human Resource Solutions (HRS) business again met revenue growth expectations despite the low interest rate environment and moderating weakness in customer employment levels. I am particularly encouraged that customer retention remains ahead of plan, and that order levels during the quarter increased in the mid-teens on a percentage basis compared to last year's second quarter. We remain confident that we can post double-digit order growth for the year."[sic]

"Comdata's bottom-line performance during the quarter was solid, especially given the on-going challenges in the transportation market. Transportation revenue during the quarter was slightly less than anticipated, primarily due to softness in the transportation industry. Transaction levels in the over-the-road trucking market slowed considerably during the first two months of the quarter before rebounding in June. Stored Value Systems (SVS) enjoyed strong performances in both gift card sales and transactions, and we expect SVS to continue its solid performance through the balance of the year. Comdata's emerging businesses again gained traction during the quarter and contributed meaningfully to growth."

47. On October 15, 2003, the Individual Defendants caused the Company to issue a press

release entitled "Ceridian Corporation Reports Solid Third Quarter Results." The press release stated

in part:

Ceridian Corporation today reported third quarter 2003 earnings.

Third quarter 2003 net earnings were $30.3 million, or $.20 per diluted share of common stock, on revenue of $309.5 million. Supplementary schedules containing comparative 2002 quarterly results are available on Ceridian Corporation's website at www.ceridian.com.

"I am extremely pleased with Ceridian's operating results for the third quarter of 2003," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian.

"During the quarter, the Human Resource Solutions (HRS) business posted solid top-line growth despite the continuing negative economic impact from low interest rates and weak hiring trends. The U.S. human resources business met our expectations, as new business, higher float balances, better retention, and a more stable pricing environment more than offset the negative impact of the economy."[sic]

15

"I am particularly encouraged that order levels remained strong during the quarter, increasing almost 20 percent over the third quarter of last year. We are confident that we can post double-digit order growth for both the fourth quarter and the year."[sic]

"Comdata posted very strong results in the quarter. Revenue was up significantly year over year, mainly on strength in Stored Value Systems. Gift card and transaction revenue both came in above plan, and new customers contributed meaningfully to revenue during the quarter. The transportation market remains challenging, as transactions in the over-the-road market were flat year over year. Revenue in merchant services and regulatory compliance remained weak, but year over year comparisons have eased somewhat. Results in the local fleet market were encouraging, where transactions were up more than 20 percent over the prior year quarter."[sic]

"Cash flow from operations remained very strong during the quarter. We have reduced our debt balance by more than $52 million since June, and continued to opportunistically repurchase Ceridian shares."

48.    On January 22, 2004, the Individual Defendants caused the Company to issue a press release entitled "Ceridian Posts Strong Fourth Quarter Results." The press release stated in part:

Ceridian Corporation today reported fourth quarter and full year 2003 earnings.

Fourth quarter 2003 net earnings were $45.6 million, or $.30 per diluted share of common stock, on revenue of $352.2 million. For 2003, net earnings were $128.0 million, or $.85 per diluted share of common stock, on revenue of $1,274.1 million. Supplementary schedules containing comparative 2002 quarterly results are available on Ceridian Corporation's website at www.ceridian.com.

"The fourth quarter 2003 operating results were strong," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian. "Revenue growth in the Human Resource Solutions (HRS) business accelerated during the quarter and hit our target for the year. The business posted its sixth consecutive quarter of top line growth despite continuing weakness in customer employment levels."[sic]

"I am particularly encouraged by the improving operational performance in HRS. Customer retention finished the year at an all time high of over 90 percent. Total HRS orders for the year were also at an all time high, up 7.5 percent over the strong performance posted last year. Fourth quarter installations were strong, and we are well positioned going into 2004 with an installation backlog at record levels. Our 2004 plan calls for double digit order growth and maintaining the excellent retention levels achieved in 2003."[sic]

"Comdata's performance during the quarter was very solid. Revenue during the quarter came in well above our expected range, mainly on strength in Stored Value Systems. Card shipments were extremely strong, and processing transactions exceeded our expectations. Transactions in the over the road market were in line

16

with our expectations for the quarter and gained momentum in the month of December. Equipment sales to truck stops continued to be weak. Comdata's profits were strong, but on a percentage basis margins were somewhat lower than our guidance due to the strength of lower margin card sales in the revenue mix."[sic]

"The outlook for Comdata in 2004 is promising. The economic environment surrounding Comdata's core business appears to be improving, and the trend toward electronic payments and cash cards shows no indication of slowing down. Recently introduced services continue to gain traction and are expected to contribute meaningfully to growth."

49. The press release also disclosed an SEC investigation:

Ceridian also announced that it is responding to a document request from the Securities and Exchange Commission (SEC), and has been advised that the SEC has issued a formal order of investigation. The SEC has informed Ceridian that this is a non-public fact finding inquiry and that the investigation and document request do not mean that the SEC has concluded that Ceridian has violated any securities laws. Ceridian is fully cooperating with the request.

50. On February 18, 2004, the Individual Defendants caused the Company to issue a press release entitled "Ceridian Reports Change in Revenue Recognition Policy at Stored Value Systems; Results for 2000-2003 to be Restated 2004 Guidance Revised Webcast Teleconference at 8:30 a.m. EST on February 19, 2004." The press release stated in part:

Ceridian Corporation announced today that it is changing its revenue recognition policy at its Stored Value Systems ("SVS") unit, a wholly owned subsidiary of its Comdata business that provides gift card and related processing principally to the retail industry. The change will be applied retroactively, and is being made with the concurrence of the Company's outside auditors, KPMG LLP.

The change in revenue recognition results from a reassessment of the accounting for revenue related to stored value card sales and transaction processing. The revised policy supersedes the revenue recognition methodology previously applied by the Company for periods prior to July 1, 2003. In addition, the conclusion is that revenue recognition at the SVS unit should not have been revised based on the guidance in EITF Issue 00-21, which was effective for fiscal periods beginning July 1, 2003. The original change in July 1, 2003 was made with the concurrence of our outside auditors.

On a preliminary basis, the Company expects the cumulative effect of the adjustment for the years 2000 through 2003 will be to increase deferred income on Ceridian's balance sheet as of December 31, 2003, by approximately $16 million. Previously reported revenue and earnings for Ceridian's Comdata business segment will be restated for the years 2000 through 2003. As a result, the Company's consolidated financial statements will also be restated for those years. The following additional estimates are preliminary and are subject to completion by the Company of

17

its analysis and completion of the audit by the Company's outside auditors:

For 2003, the Company's previously reported total revenue of $1,274 million will be reduced by approximately $20 million and previously reported pre-tax profit of $197 million will be reduced by approximately $5 million. Previously reported earnings per share of $.85 will be reduced by $.02.

Revenue and earnings before taxes for 2002 will be decreased by $2 million and $2 million, respectively. Earnings per share for 2002 will be decreased by $.01.

Revenue and earnings before taxes for 2001 will be decreased by $10 million and $4 million, respectively. Earnings per share for 2001 will be decreased by $.02.

Revenue and earnings before taxes for 2000 will be decreased by $7 million and $5 million, respectively. Earnings per share for 2000 will be decreased by $.02

Further information as to the impact on particular periods will be provided as the Company completes its restatement.

The revenue recognition change also affects the Company's previously communicated guidance for 2004. Revenue and pre-tax earnings for the Comdata unit for 2004 are expected to be reduced by $12 million and $4 million, respectively. Earnings per share for 2004 are expected to decrease the previously announced range of $.90 to $.98 by approximately $.02. On a quarterly basis, the year 2004 will become more front half loaded. The Company's adjusted guidance for 2004, by quarter, appears near the end of this release.

Ronald L. Turner, Chairman, President and Chief Executive Officer of Ceridian said, "I want to emphasize that with this revenue recognition change, revenue and profit at SVS have not been lost, but simply deferred and recognized over a longer time period. The vast majority of the change relates to card revenue related to customers for whom we also provide processing. Revenue from card sales will now be deferred at the time of shipment and revenue will be recognized over approximately the same period as processing occurs. Once processing of cards commences, which can on average take six to eight months from shipment date, recognition of card revenue commences. Approximately ninety percent of the deferred card revenue will be recognized over the first six months and the remaining ten percent will be recognized up to roughly an additional 24 months. The change has no impact on the strength of SVS, its business, its future, or Ceridian's cash flow, business or prospects. SVS continues to be a strong and rapidly growing business for Ceridian, and we believe its prospects are strong."[sic]

"In our January 22, 2004 press release and webcasted conference call, we set forth in detail the impact of the SVS accounting change that was effective July 2003, so our investors could clearly understand the impact on comparisons to prior years' results. Subsequent to our earnings release and conference call, KPMG advised us that we needed to reevaluate our revenue recognition policy at SVS. After extensive discussions and evaluation, the determination was made that our revenue recognition policy at SVS required revision."[sic]

"To our knowledge, revenue recognition at SVS has not been a specific focus of the SEC formal investigation that we reported on January 22, 2004. The SEC

18

Division of Corporation Finance, which typically reviews SEC filings of all public companies, has asked the Company for a fuller explanation of our prior SVS revenue recognition change. This new change in SVS revenue recognition could cause additional inquiries from the SEC."

The Company expects to amend the appropriate prior filings with the SEC. These amendments will contain the Company's restated financial statements. Ceridian anticipates filing these amendments as soon as the restatement process has been completed. As a result of the restatement, the financial statements contained in our filings with the SEC for the periods covered by the restatement should no longer be relied upon.

51. Although Ceridian's stock price declined on this news, it soon recovered, as the accounting issue was considered minor and limited. Moreover, the other accounting manipulations continued to be concealed. Indicative of this was an analyst report by Wachovia Securities on February 19, 2004, which stated in part:

* Yesterday, CEN announced a change in its revenue recognition policy for card sales at Store Value Systems. The change will be applied retroactively and will have the immediate impact of reducing reported EPS for years 2000-2003 by no more than $0.02 per year. As a result of the change, EPS guidance for 2004 has been reduced by $0.02 to a range of $.88 to $.96.

* SCOPE LIMITED, NO CHANGE TO CASH FLOWS. Investors should note that there is no change to historical or projected cash flows. The accounting change impacts only revenue recognition for card sales at SVS. Revenue and profit will be simply deferred and recognized over a longer period of time. It does not impact card processing revenue or any other area of the business. Also, for perspective, we note that this change impacts less than 1.5% of revenue and less than 2% of net income.

* ANNOUNCEMENT MAY PRESENT A BUYING OPPORTUNITY. This type of announcement may have a negative short-term impact on the stock. Our sense is that business is progressing according to plan.

52. On April 15, 2004, the Individual Defendants caused the Company to issue a press release entitled "Ceridian Posts Strong First Quarter Results." The press release stated in part:

Ceridian Corporation today reported first quarter 2004 earnings.

First quarter 2004 net earnings were $24.3 million, or $.16 per diluted share of common stock, on revenue of $326.5 million. First quarter 2003 net earnings were $28.1 million, or $.19 per diluted share of common stock, on revenue of $314.1 million.

"The first quarter 2004 operating results were strong in almost every respect," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian.

19

"Revenue in both businesses hit our targets for the first quarter, and earnings per share were solidly on plan. The Human Resource Solutions (HRS) business posted top line growth for the seventh consecutive quarter, despite the previously announced shift of W-2 processing revenue out of the quarter and moderating weakness in customer employment levels."[sic]

"Operational performance in HRS continues to be encouraging. Customer retention is on track to meet our target of over 90 percent for the year, and order growth for the quarter was solidly in double digits. Installations were also strong, meeting an aggressive plan."[sic]

"Comdata's performance during the quarter was also very solid. Revenue came in within the expected range, mainly on strength in Stored Value Systems, higher transaction levels in the transportation business, customer adoption of Comdata's BusinessLink service, and improvement in the regulatory compliance business. Conversely, equipment sales to truck stops remained weak."

Guidance for 2004

Our guidance for 2004 is unchanged.

Earnings per share for 2004 are expected to be between $.88 and $.96.

Total 2004 revenue is expected to be between $1,333 million and $1,378 million. HRS revenue for the year is expected to be between $1,000 million and $1,030 million. HRS margins should improve to a range of 10.5 percent to 11.5 percent. Comdata revenue for 2004 is expected to be between $333 million and $348 million, with margins in the range of 32 percent to 33 percent.

53.     On July 19, 2004, Ceridian's stock closed at $20.34 per share.

54.     On July 19, 2004, after the market closed, the Individual Defendants caused the

Company to issue a press release entitled "Ceridian Postpones its Second Quarter Earnings Release

and Conference Call." The press release stated in part:

Ceridian Corporation announced today that it had postponed its second quarter earnings release and related investors teleconference and Webcast, previously scheduled to take place on Tuesday, July 20, 2004. The company will announce the date of its earnings release, teleconference and Webcast at a later date. The delay was prompted by the company's recent initiation of a review focusing on the capitalization and expensing of certain costs in its U.S. Human Resource Solution business. The review, which is still in its early stages, is being conducted under the direction of the company's Audit Committee, with the assistance of Deloitte & Touche LLP. It is possible that the review may have an impact on the company's consolidated financial statements for the second quarter of 2004 and for previously reported periods, as well as guidance.

Ronald L. Turner, the company's chairman, president and chief executive officer, said "A concern was raised internally very recently regarding capitalization and expensing of certain costs in U.S. Human Resource Solutions business. We

20

responded immediately and aggressively to make sure the matter is reviewed appropriately and thoroughly. We regret our decision today to delay our earnings announcement due to the timing of this review and the amount of time necessary for a complete and thorough review. We will reschedule our earnings release and teleconference as quickly as practical. We believe the business is sound. Although each of our businesses has positive developments in the quarter, we will not discuss any details until we are in a position to make a complete disclosure."

55.     On this news, Ceridian's stock price dropped to $18.20 per share, on volume of 6.8 million shares.

**IMPROPER FINANCIAL REPORTING
DURING THE RELEVANT PERIOD**

56.     In order to inflate the price of Ceridian's stock, defendants caused the Company to falsely report its results for 2003 and Q1:04 through improper capitalization of costs. The Company's 2003 and Q1:04 results were included in a Form 10-K or in Form 10-Qs filed with the SEC. The results were also included in press releases disseminated to the public.

57.     The Individual Defendants have now caused Ceridian to admit that its 2000-2003 results were false due to revenue recognition and that it is investigating capitalization of costs such that its 2003 to Q1:04 financial statements were not a fair presentation of Ceridian's results and were presented in violation of GAAP and SEC rules.

58.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. '210.4-01(a)(1)), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. '210.10-01(a).

59.     Pursuant to GAAP, as set forth in SOP 97-2, which describes the accounting for software licenses, revenue should not be recognized unless there is persuasive evidence of an

agreement, collection is probable and delivery has occurred.

60. During the Relevant Period, the Individual Defendants caused Ceridian to improperly recognize revenue even though these conditions did not exist.

61. GAAP, as set forth in SOP 98-1 (with which Ceridian claimed to comply) also requires that costs of computer software for internal use not be capitalized during the preliminary project stage. SOP 98-1, 20. *See also* FASB Statement of Financial Accounting Standards No. 86.

62. Notwithstanding these provisions, Ceridian capitalized costs that should have been expensed. The Company has now announced an investigation into its capitalization policies which it states may impact its previously reported financial statements.

63. Due to these accounting improprieties, the Individual Defendants caused the Company to present its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, 10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

64.     Further, the undisclosed adverse information concealed by the Individual Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

65.     As a result of the Individual Defendants' actions, Ceridian's market capitalization has been damaged by over $800 million.  At the same time that the defendants were causing Ceridian to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better

by selling over $4.1 million of their personally held stock.

## ILLEGAL INSIDER SELLING

66.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Ceridian stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| **Ronald L. Turner** | 1/31/2004 | 4,035 | $ 20.56 | $ 82,959.60 |
| | 9/9/2003 | 600 | $ 19.99 | $ 11,994.00 |
| | 9/9/2003 | 100 | $ 19.98 | $ 1,998.00 |
| | 9/9/2003 | 600 | $ 19.97 | $ 11,982.00 |
| | 9/9/2003 | 1,000 | $ 19.96 | $ 19,960.00 |
| | 9/9/2003 | 200 | $ 19.95 | $ 3,990.00 |
| | 9/9/2003 | 3,500 | $ 19.94 | $ 69,790.00 |
| | 9/9/2003 | 7,400 | $ 19.93 | $ 147,482.00 |
| | 9/9/2003 | 4,500 | $ 19.92 | $ 89,640.00 |
| | 9/9/2003 | 3,000 | $ 19.91 | $ 59,730.00 |
| | 9/9/2003 | 11,300 | $ 19.90 | $ 224,870.00 |
| | 9/9/2003 | 3,100 | $ 19.89 | $ 61,659.00 |
| | 9/9/2003 | 300 | $ 19.88 | $ 5,964.00 |
| | 9/9/2003 | 4,400 | $ 19.87 | $ 87,428.00 |
| | 9/9/2003 | 3,900 | $ 19.86 | $ 77,454.00 |
| | 9/9/2003 | 900 | $ 19.85 | $ 17,865.00 |
| | 9/9/2003 | 800 | $ 19.83 | $ 15,864.00 |
| | 9/9/2003 | 400 | $ 19.81 | $ 7,924.00 |
| | 9/9/2003 | 4,500 | $ 19.80 | $ 89,100.00 |
| | 9/9/2003 | 100 | $ 19.70 | $ 1,970.00 |
| | 9/9/2003 | 100 | $ 19.71 | $ 1,971.00 |
| | 9/9/2003 | 300 | $ 19.75 | $ 5,925.00 |
| | | **55,035** | | **$1,097,519.60** |
| **John R. Eickhoff** | 9/8/2003 | 65,340 | $ 20.00 | $1,306,800.00 |
| | 5/15/2003 | 49,958 | $ 16.49 | $ 823,807.42 |
| | 5/15/2003 | 50,000 | $ 16.62 | $ 831,000.00 |
| | | **165,298** | | **$2,961,607.42** |
| **Robert H. Ewald** | 7/31/2004 | **3,029** | $ 18.00 | $ 54,522.00 |
| **Shirley J. Hughes** | 1/31/2004 | **742** | $ 20.56 | $ 15,255.52 |
| **Gary A. Krow** | 1/31/2004 | **1,118** | $ 20.56 | $ 22,986.08 |

24

| Gary M. Nelson | 1/31/2004 | 922 | $ 20.56 | $ 18,956.32 |
| | TOTAL | 223,115 | | $4,170,846.94 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiff brings this action derivatively in the right and for the benefit of Ceridian to redress injuries suffered, and to be suffered, by Ceridian as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Ceridian is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

68.     Plaintiff will adequately and fairly represent the interests of Ceridian in enforcing and prosecuting its rights.

69.     Plaintiff is and was an owner of the stock of Ceridian during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

70.     The current Board of Ceridian consists of the following eight individuals: defendants Turner, Ewald, Cadogan, Chabraja, LeMay, Lewis, Uhrich and White. Plaintiff has not made any demand on the present Board of Ceridian to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information

25

regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current members of the Ceridian Board participated in the illegal insider selling:

(i) During the Relevant Period, Turner sold 55,035 shares of Ceridian stock for proceeds of $1,097,519.60; and

(ii) During the Relevant Period, Ewald sold 3,029 shares of Ceridian stock for proceeds of $54,522. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and any demand upon them is futile;

(b) The Nominating and Corporate Governance Committee of the Board determines the composition and organization of the Board as well as the compensation for all non-employee directors of Ceridian. The Nominating and Corporate Governance Committee is comprised of defendants Chabraja, LeMay and White. As the members of the Nominating and Corporate Governance Committee singularly control the other defendants' awards, the remaining non-employee members of the Board will not institute this action against defendants Chabraja, LeMay and White. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Cadogan, Uhrich and Lewis is futile;

(c) The principal professional occupation of defendant Turner is his employment with Ceridian, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:03, Ceridian paid defendant Turner $1,443,438, in salary, bonus and other compensation, awarded him 37,010 restricted shares of

Ceridian, and granted him 275,000 options to purchase Ceridian stock. Accordingly, defendant Turner lacks independence from defendants Chabraja, LeMay and White, defendants who are not disinterested and who exert influence over defendant Turner's compensation by virtue of their position as Compensation and Human Resources Committee. This lack of independence renders defendant Turner incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)     The principal professional occupation of defendant Ewald is his employment with Ceridian, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:03, Ceridian paid defendant Ewald $523,662 in salary, bonus and other compensation, awarded him 508,188 shares of restricted Ceridian stock, and granted him 166,650 options to purchase Ceridian stock. Accordingly, defendant Ewald lacks independence from defendants Chabraja, LeMay and White, defendants who are not disinterested and who exert influence over defendant Ewald's compensation by virtue of their position as the Compensation and Human Resources Committee. This lack of independence renders defendant Ewald incapable of impartially considering a demand to commence and vigorously prosecute this action;

(e)     According to Ceridian's Proxy Statement filed with the SEC on or about March 30, 2004, defendants Lewis, Cadogan and Uhrich were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible for monitoring the integrity of Ceridian's financial reporting process, the Company's financial statements, and reviewing with management the financial information to be included in the Company's Annual Report on Form 10-K

27

and Quarterly Reports on Form 10-Q. Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in Ceridian's Annual Report on Form 10-K for the year ended December 31, 2003, as filed with the SEC. By such actions, defendants Lewis, Cadogan and Uhrich breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(f)     Defendants Cadogan, Chabraja, LeMay, Lewis, Unrich and White receive an annual retainer of $52,000, plus 4,000 options vesting six months after the date of grant. Ceridian's retainer and stock option incentive plan are distributed at the beginning of Ceridian's fiscal year, and as of the date of the annual stockholder meeting, respectively. As such, defendants Cadogan, Chabraja, LeMay, Lewis, Uhrich and White were granted $52,000 on or about January 2003, and 2004, as well as were awarded options to purchase 4,000 shares of Ceridian's common stock at fair market value on the date of grant on or about May 2003, and again in May 2004. Given that the value of the options for defendants Cadogan, Chabraja, LeMay, Lewis, Uhrich and White potentially run into the millions of dollars, one cannot conclude realistically that defendants Cadogan, Chabraja, LeMay, Lewis, Uhrich and White are able to objectively and impartially consider a demand to bring litigation against those to whom they are beholden to for their current position and future position on Ceridian's Board;

(g)     The stock options granted to defendants Cadogan, Chabraja, LeMay, Lewis, Uhrich and White, which are both vested and unvested, are so valuable that they create a considerable financial incentive for these directors to retain their positions as directors. As a result,

28

plaintiff contends that it is more reasonable to assume an individual who has already received, and who expects to receive still more options of such significant value could not objectively decide whether to commence legal proceedings against his or her fellow directors;

(h)     The entire Ceridian Board and senior management participated in the wrongs complained of herein. Ceridian's directors are not disinterested or independent due to the following: defendants Turner, Ewald, Cadogan, Chabraja, LeMay, Lewis, Uhrich and White served on the Ceridian Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Ceridian and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Ceridian Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Ceridian to millions of dollars in liability for possible violations of applicable securities laws;

(i)     As of March 30, 2004, defendants Turner, Ewald, Cadogan, Chabraja, LeMay, Lewis, Uhrich and White owned millions of Ceridian shares. Specifically, defendant Turner owned 1,932,289 shares; defendant Ewald owned 81,216 shares; defendant Cadogan owned 34,630 shares; defendant Chabraja owned 40,018 shares; defendant LeMay owned 48,063 shares; defendant Lewis owned 52,536 shares; defendant Uhrich owned 55,707 shares; and defendant White owned 13,345 shares. Thus, these defendants had every incentive to participate in the improper accounting in order to effectuate a commensurate rise in Ceridian's stock price;

(j)     The Director Defendants of Ceridian, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Ceridian's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(k)     In order to bring this suit, all of the directors of Ceridian would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(l)     The acts complained of constitute violations of the fiduciary duties owed by Ceridian's officers and directors and these acts are incapable of ratification;

(m)     Each of the Director Defendants of Ceridian authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(n)     Any suit by the current directors of Ceridian to remedy these wrongs would likely expose the Individual Defendants and Ceridian to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

30

(o)     Ceridian has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ceridian any part of the damages Ceridian suffered and will suffer thereby;

(p)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

(q)     If Ceridian's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Ceridian. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Ceridian against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Ceridian, there would be no directors' and officers' insurance protection and thus, this is a further

reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Ceridian to sue them, since they will face a large uninsured liability.

71.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Ceridian for any of the wrongdoing alleged by plaintiff herein.

## COUNT ONE

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

72.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

73.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Ceridian common stock on the basis of such information.

74.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Ceridian common stock.

75.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Ceridian common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

76.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT TWO

### Against All Defendants for Breach of Fiduciary Duty

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     The Individual Defendants owed and owe Ceridian fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Ceridian the highest obligation of good faith, fair dealing, loyalty and due care.

79.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

80.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

81.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Ceridian has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

82.     Plaintiff on behalf of Ceridian has no adequate remedy at law.

## COUNT THREE

### Against All Defendants for Abuse of Control

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ceridian, for which they are legally responsible.

85.     As a direct and proximate result of the Individual Defendants' abuse of control, Ceridian has sustained significant damages.

86.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of Ceridian has no adequate remedy at law.

## COUNT FOUR

### Against All Defendants for Gross Mismanagement

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ceridian in a manner consistent with the operations of a publicly held corporation.

90.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ceridian has sustained significant damages in excess of

34

hundreds of millions of dollars.

91.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

92.     Plaintiff on behalf of Ceridian has no adequate remedy at law.

## COUNT FIVE

### Against All Defendants for Waste of Corporate Assets

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Ceridian to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

95.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

96.     Plaintiff on behalf of Ceridian has no adequate remedy at law.

## COUNT SIX

### Against All Defendants for Unjust Enrichment

97.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.     By their wrongful acts and omissions, defendants were unjustly enriched at the

expense of and to the detriment of Ceridian.

99.     Plaintiff, as a shareholder and representative of Ceridian, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Ceridian has an effective remedy;

C.      Awarding to Ceridian restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August__, 2004

THE SPENCE LAW FIRM
RUSSELL M. SPENCE, JR.

_____
RUSSELL M. SPENCE, JR. (#241052)

10 South Fifth Street, Suite 700
Minneapolis, MN  55402
Telephone: 612/375-1555
Facsimile: 612/375-1511

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
1010 Second Ave., Suite 2360
San Diego, CA  92101
Telephone:  619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

G:\Ceridian\Complaints\Park Deriv Cpt.wpd

37



Attorneys & Counselors at Law

August 13, 2004

Clerk of Court                                          **HAND DELIVERED**
United States District Court
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

     Re:    James Park, et al. v. Ronald L. Turner, et al.
            Our File No: 1311-11227

Dear Sir or Madam:

Enclosed for filing in the above-referenced matter please find the following:

    1.     Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty,
          Abuse of Control, Gross Mismanagement, Waste of Corporate Assets and
          Unjust Enrichment; and

    2.     Filing Fee of $150.00

I appreciate your assistance in this matter.

              Very Truly,

              The **Spence Law Firm**

              Mick Spence

MS/mbb
Enclosure
cc:   Jeffrey Fink, Esq.
       Nadeem Faruqi, Esq.